IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF BELLA S.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF BELLA S., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

STACY S., APPELLANT.


Filed February 18, 2020.    No. A-19-511.


Appeal from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Bernard J. Straetker, Deputy Scotts Bluff County Public Defender, for appellant.

Danielle Larson, Deputy Scotts Bluff County Attorney, for appellee.

Katy A. Reichert, of Chaloupka, Holyoke, Snyder, Chaloupka & Longoria, P.C., L.L.O., guardian ad litem.


MOORE, Chief Judge, and ARTERBURN and WELCH, Judges.

WELCH, Judge.

INTRODUCTION

Stacy S., natural mother of Bella S., appeals the order of the Scotts Bluff County Court, sitting as a juvenile court, terminating her parental rights. Stacy contends that the court erred in terminating her parental rights pursuant to Neb. Rev. Stat. § 43-292(2) and (4) (Reissue 2016), finding beyond a reasonable doubt through a qualified expert that Stacy's continued custody of Bella, an Indian child, is likely to result in serious emotional or physical damage to Bella, and

- 1 -

finding that termination was in Bella's best interests. Based upon the analysis set forth herein, we affirm.

## STATEMENT OF FACTS

Stacy and Michael F. are the parents of Bella, who was born out of wedlock in February 2016. Michael is an enrolled member of the Ninilchik Tribal Village in Alaska. In 2016, a paternity action established Michael was Bella's father, and in March 2017, a court placed temporary legal custody of Bella with the court and granted Stacy temporary physical custody with Michael having visitation rights. In April 2017, the court ordered Bella be taken into temporary custody of the Nebraska Department of Health and Human Services (DHHS) and later adjudicated Bella in June 2017. By January 2018, a bridge order was entered giving Michael sole legal and physical custody with parenting time for Stacy and also transferring jurisdiction to the District Court of Scotts Bluff County. In March 2018, Stacy filed a motion to modify custody and visitation. From August 2018 to November 2018, Michael kept Bella away from Stacy and eventually moved with Bella to Alaska. Subsequently, in November 2018, the court granted Stacy legal and physical custody of Bella.

Since Bella's birth, several intakes have been opened with DHHS involving Stacy's use of drugs. In December 2016, an intake was opened with DHHS regarding Stacy and Bella based on allegations that Stacy was using drugs with Bella in her care. A January 2017 hair follicle test on Bella resulted in a positive indication for methamphetamine with levels around 4,008 pg/mg, and an April hair follicle test was 760 pg/mg higher than her January level. Additionally, Bella's hair follicle tests indicated positive results for THC, which is the "chief intoxicant in marijuana." Merriam-Webster's Collegiate Dictionary 1217 (10th ed. 2001). However, testing performed on Stacy did not indicate a corresponding positive result for marijuana or THC. Thereafter, the case closed, and Bella was placed with Michael.

In April 2017, a second intake occurred with DHHS based on concerns that Stacy was using methamphetamine and her use prevented Stacy from removing Bella from her car seat without assistance. A May 2017 hair follicle test performed on Stacy showed positive results for amphetamine and methamphetamine. In May 2017, a hair follicle test performed on Bella showed positive results for methamphetamine and, according to Anna Harberts, a DHHS child protective services initial assessment worker, this test result was the highest level for a child the DHHS office had encountered. Bella was adjudicated in June 2017, and by January 2018, a bridge order was entered giving Michael sole legal and physical custody with parenting time for Stacy and also transferring jurisdiction to the District Court of Scotts Bluff County.

In December 2018, DHHS received another intake regarding Stacy alleging that Stacy was using drugs. Also in December, law enforcement conducted two drug busts at the home of her friend Robert Turner and at the Spring Creek Ranch in which Stacy was implicated and of which we will provide greater detail later in this opinion. When Kortni Zeiler, a DHHS children and family specialist, met with Stacy in January 2019, Zeiler noted that Stacy was speaking rapidly and would not make eye contact with her, which Zeiler's training indicated was indicative of drug use.

The following month, in February 2019, the State filed a motion for temporary custody of Bella. In connection with the motion, the State filed an affidavit stating that DHHS received an

intake alleging that Stacy was using methamphetamine; that this was the third time the State had filed a request for custody concerning Bella; and that initial contact was made with Stacy who appeared very erratic, was talking fast, and not always tracking well, but that her demeanor was different during the second contact. The affidavit also alleged that Michael had contact with Bella and that Bella's hair had been cut and Stacy's hair had been cut and dyed and noted that hair cutting and dying are commonly used when people suspect a hair follicle test will be conducted. Bella was placed in Michael's custody on February 8, 2019.

In February 2019, the State filed an amended motion to terminate parental rights under § 43-292(2) and (4). During the hearing held in April, the court considered adjudication under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) and the termination of Stacy's parental rights. During the hearing, testimony was adduced from witnesses including Michael; Caroline Teeple, a DHHS case manager; Zeiler, a DHHS children and family specialist; Scotts Bluff County Sheriff's Investigator Bryan Martinez; and Nebraska State Patrol Lieutenant Brian Eads. The court also received deposition testimony from Richard Encelewski, a member of the Ninilchik tribe and president and chairman of the Ninilchik Traditional Council. At the time of the hearing, Bella remained in Michael's custody.

### MICHAEL

Michael testified that he suspected Stacy was using methamphetamine and that there were times he believed Bella had been sick due to exposure to drugs. Michael testified that during one of his overnight visits in December 2016, when Bella was about 7 months old, Bella did not sleep and "puk[ed] white stuff out of her nose and scream[ed] like she was on fire." When Michael discussed the incident with Stacy, she claimed Bella was teething, but Michael testified he had experienced withdrawal and it was "pretty bad." Michael also testified that Bella's hearing tested at 30 percent, leading to a diagnosis of hearing loss, which was consistent with a child who has been exposed to high levels of methamphetamine.

Michael also testified that he became concerned in April 2018 on a day when he was to pick up Bella for visitation. On that day, he was concerned when he saw Shaun Turner's car at the apartment where Stacy and Bella were staying because he knew that Turner was using methamphetamine. When he went to Stacy's apartment to pick up Bella after he got off work, pursuant to the terms of the parties' visitation agreement, he stated that Stacy was high because she was jumping around and fidgety. Michael's concern that Stacy was using methamphetamine continued throughout April, May, and June 2018 because when Stacy dropped Bella off with Michael for his visitation, Stacy was "super hyper, eyes dilated, sweaty." Additionally, Michael testified he saw Turner's car "on various pick-ups [and] drop-offs." Michael testified Stacy would brag about falsifying drug tests by using fake urine. Around September 2018, Stacy refused Michael's request to take a hair follicle test.

### CAROLINE TEEPLE

Teeple provided testimony that included Stacy's recovery efforts following her second intake but before her third intake. Teeple testified that DHHS provided services to Stacy including parenting time, drug testing, and weekly counseling with a substance abuse counselor and that Stacy completed a psychological and parenting evaluation, a substance use evaluation, and a

healthy communications class, all between May 2017 and January 2018. Teeple testified the psychological and parenting evaluation noted Stacy was diagnosed with methamphetamine use disorder, in early remission, and an unspecified adjustment disorder. Teeple testified the substance use evaluation was used in creating a case plan for Stacy, which included participation in weekly counseling and 12-step meetings, sobriety monitoring, and involvement with narcotics anonymous (NA). Teeple testified Stacy was actively involved in a Celebrate Recovery group and a 12-step program.

Teeple testified Stacy was very good at doing what she needed to do, was always willing to meet with Teeple, and made use of the supervised parenting time. A bridge order was entered in January 2018 that continued Bella's placement with Michael. Later, in April 2018, the district court modified Bella's custody to joint custody.

KORTNI ZEILER

Zeiler testified she received a December 2018 intake alleging Stacy was using drugs. At that time, Zeiler noticed recent criminal activity involving Stacy. Zeiler first met with Stacy in January 2019, and during that meeting, she noted Stacy was speaking rapidly and would not make eye contact with her. Zeiler testified she is trained to look for physical indicators of drug use and that rapid speech and lack of eye contact are indicators of drug use. Zeiler testified she met with Stacy later in January and they put a safety plan in place which included conditions that Stacy was not to be alone with her children and contact was to be monitored by Stacy's mother, which Stacy agreed to for that weekend. Although Zieler offered Stacy a voluntary plan with DHHS, Stacy refused that offer.

DRUG BUSTS

In December 2018, members of law enforcement executed a search warrant on a house owned by one of Stacy's friends, Newton, and a later search at a property known as the Spring Creek Ranch involving Turner, who Stacy had previously dated. Members of law enforcement involved in one or both of these searches were Scotts Bluff County Sheriff's Investigator Bryan Martinez and Lieutenant Eads, the task force commander for WING Drug Task Force, who had participated in over 5,000 hours of continuing education training with approximately 1,000 hours of that dedicated to drugs and was certified as a drug recognition expert.

The search of Newton's home revealed a marijuana growing operation in a potato cellar on the property as well as methamphetamine, LSD, firearms, and cell phones. Additionally, officers discovered texts between Newton and Stacy on one of the cell phones and also discovered images of child pornography on Newton's cell phone. This drug bust led to another drug bust on a property commonly called the Spring Creek Ranch which also took place in December 2018.

Officers conducting a search of the Spring Creek Ranch located a locked camper on the property. An individual, Turner, exited the camper. Eads testified that Turner had a "pretty decent amount of U.S. currency" and a weapons magazine in his pockets. Eads searched the camper locating drug paraphernalia, methamphetamine, marijuana, and approximately 47 firearms, most of which were loaded and without child locks. Eads testified there is a correlation between large amounts of firearms and illegal drugs because people are protecting "either themselves or their product from rival drug dealers or from people just trying to steal the product when they don't

have enough money to pay for it." Martinez corroborated this testimony stating that Turner had $3,000 cash on his person and that the cash combined with the items found in the camper, such as reams of small baggies, over 211 grams of methamphetamine, and digital scales, indicated Turner was involved in narcotics dealing.

Martinez further testified that after Turner was arrested, Martinez listened in on a telephone call that Turner placed to Stacy and heard Turner ask Stacy to go to the Spring Creek Ranch and destroy flash drives and hard drives, to which Stacy responded that it was already taken care of. Martinez further testified that, based on that phone call, he arrested Stacy and searched her residence locating flash drives, SIM cards, property from the Spring Creek residence, and marijuana inside a marijuana pipe. Martinez testified Bella was present when Stacy was arrested. Martinez also testified he saw fake urine and a pill inside Stacy's residence which, in his training and experience, are used to throw off drug tests. Martinez also testified Turner's debit card was located in Stacy's car. Martinez testified that Stacy told him she had previously dated Turner but they were not currently dating. Martinez testified that while Stacy said she and Turner were not currently dating, Martinez did not get that sense from reading text messages on Stacy's phone including her request for marijuana and a discussion about LSD. Martinez further testified the Spring Creek property was the address listed on Stacy's driver's license and that Stacy told him she had previously lived at the Spring Creek property.

### Richard Encelewski

The court received deposition testimony from Encelewski, who is an elder of the Ninilchik Tribe. Encelewski had previously testified as a qualified Indian expert in other cases and provided testimony about life as a member of the Ninilchik Tribe as well as the impact narcotics have on families and children.

Encelewski testified that
as an elder of the tribe we participate in a lot of the social events, so as an elder they have the -- you know, participate in cultural camps: Fish camps, elders in youth programs, we have a lot of programs we do from preschool all on up to native youth Olympics, different things that I attend the functions and support the kids and their role in the tribe here, so just all-around involvement with the tribe.

Encelewski testified about the effects of a family member's use or caregiver's use of methamphetamine on children and explained methamphetamine use destroys families, children, puts them in depression, and leads to physical and emotional harm. Encelewski further testified physical harm included "abuse, nothing being taken care of, messy diapers, clothes, everything else, living in a condition that you wouldn't put your dog in, I mean, bad stuff." Regarding emotional harm to children, Encelewski testified children suffer from aggression, "they go into their shell," and he has seen very ill effects and behavioral affects. Encelewski testified children are impacted by methamphetamine use but the community is also affected, which is why he works to "teach the right things to do and with membership bring [children] up with elders and uncles that raise people and different things and good mentors that will get them on a good course." Encelewski testified cultural programs for children who have family members using methamphetamine include fish camps, moose camps, hunting, and survival classes. Encelewski

testified that individuals of his tribe who relapse on methamphetamine are offered medical treatment programs as well as one-on-one counseling services. When asked if he reviewed documents pertaining to Bella, Encelewski testified that he knew "a little bit" and knew there were problems but was not deeply involved in the case.

## COURT ORDER

The court noted that because Bella is an Indian child, active efforts, as required by the Indian Child Welfare Act (ICWA), is the standard for terminating parental rights, which requires more than the reasonable efforts standard. The court articulated that at least some efforts should be culturally relevant. The court found the alleged statutory grounds to terminate Stacy's parental rights existed and that additional ICWA requirements were satisfied. The court ultimately determined that terminating Stacy's parental rights were in Bella's best interests.

More specifically, the court found the State established by clear and convincing evidence that the conditions set forth in § 43-292(2) and (4) existed due to Stacy repeatedly placing Bella in dangerous contact with her drug related lifestyle. When analyzing active efforts, the court observed that the State provided numerous services to Stacy, but the only service she requested was help from DHHS in retrieving her older child's birth certificate; that the State attempted to ensure Bella's continued connection with Native American culture and heritage by placing her with her Native American parent; and that the testimony established by clear and convincing evidence that further efforts to rehabilitate Stacy from her drug-related lifestyle would be futile. The court determined expert witness testimony governing the devastation to children located in the home of a methamphetamine user and trafficker established beyond a reasonable doubt that continued custody of Bella by Stacy was likely to result in serious emotional or physical damage to Bella. Finally, the court then determined terminating Stacy's parental rights was in the best interests of Bella due to Stacy's drug use and drug related associations putting Bella in constant harm.

## ASSIGNMENTS OF ERROR

Stacy argues, renumbered and restated, that the court erred in (1) adjudicating Bella as a child within the meaning of § 43-247(3)(a), (2) finding the State established by clear and convincing evidence that Stacy had substantially and continuously or repeatedly neglected or refused to provide the juvenile necessary parental care or protection and did not prove the statutory ground of debauchery, (3) finding terminating Stacy's parental rights were in the best interest of her daughter, and (4) finding the State established beyond a reasonable doubt through a qualified expert that continued custody of an Indian child by Stacy is likely to result in serious emotional or physical damage to the child.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Robert W.*, 27 Neb. App. 11, 925 N.W.2d 714 (2019). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016); *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

## ANALYSIS

### ADJUDICATION

Stacy's first assignment of error suggests the court committed error when it adjudicated Bella. In the Summary of the Argument section, Stacy argues the State did not establish by the greater weight of the evidence that her daughter should be adjudicated within § 43-247(3)(a), but she did not address this assigned error in the argument section of her brief. Because Stacy did not specifically argue this error, we do not address it other than to ensure this court has jurisdiction over this case. See *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019) (to be considered by appellate court, alleged error must be both specifically assigned and specifically argued in brief of party asserting error).

Although we note that the court's termination order does not appear to contain findings governing the State's separate request for adjudication in connection with its request for termination, we find that an adjudication order was not necessary in connection with the specific request for termination here. In *In re Interest of Joshua M. et al.*, 256 Neb. 596, 591 N.W.2d 557 (1999), the Nebraska Supreme Court addressed when a juvenile court must adjudicate a child prior to terminating parental rights. The Nebraska Supreme Court observed:

Unlike § 43-292(6) and (7), § 43-292(1) through (5) do not require, imply, or contemplate juvenile court involvement, including adjudication, prior to the filing of the petition for termination of parental rights. Instead, subsections (1) through (5) each concern historical actions or conditions of the parents such as abandonment, neglect, unfitnesses, and mental deficiency. There is no requirement of longitudinal involvement of the juvenile court under § 43-292(1) through (5), much less a prior adjudication.

*In re Interest of Joshua M. et al.*, 256 Neb. at 609-10, 591 N.W.2d 557 at 566.

Accordingly, although the court in the present action did not make a specific finding regarding the adjudication of Bella pursuant to § 43-247(3)(a), the court did not lack jurisdiction to proceed with the State's request to terminate Stacy's parental rights pursuant to § 43-292(2) and (4), and this court likewise has jurisdiction to proceed with this appeal.

### STATUTORY GROUNDS FOR TERMINATION

Stacy contends that the court erred in terminating her parental rights pursuant to § 43-292(2) and (4) because these statutory grounds were not established by clear and convincing evidence and no evidence was presented suggesting Bella had been exposed to methamphetamine following the closure of the previous juvenile case in January 2018.

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Stacy's parental rights to Bella, the court found that two separate statutory grounds for termination existed: § 43-292(2) (parent has substantially and continuously or repeatedly neglected and refused to give juvenile necessary parental care and protection), and § 43-292(4) (parent unfit by reason of debauchery, habitual use of narcotic drugs, or repeated lewd

and lascivious behavior, which conduct is found by court to be seriously detrimental to health, morals, or well-being of juvenile). Both grounds relate to the court's penultimate statement that "[Stacy] has continuously and repeatedly placed Bella in dangerous situations involving illegal drug use and sales."

The Nebraska Supreme Court has discussed neglect in the following context:

Because of the [mother's] lack of insight and her lack of motivation to place the interests of her children ahead of her own, the court did not err in finding there was clear and convincing evidence to establish that the [mother] had substantially, continuously, and repeatedly neglected her children and had refused to give them the necessary parental care and protection.

*In re Interest of B.B. et al.*, 239 Neb. 952, 956, 479 N.W.2d 787, 791 (1992). Additionally, more recently in *In re Interest of Brooklyn T. & Charlotte T.*, 26 Neb. App. 669, 922 N.W.2d 240 (2018), this court found that the State's factual basis was sufficient to show that the mother had substantially and continuously or repeatedly neglected to give her children necessary parental protection and care where the factual basis established that the mother's drug use prevented her from providing adequate parental care to a child which led to the removal of her two children from the mother's home and the mother had not adequately addressed her drug use at the time of the termination hearing.

A similar situation exists in the present case. Bella was previously removed from Stacy's care on three occasions due to Stacy's use of methamphetamine. In connection with those removals, Bella tested positive for methamphetamine at the highest level for a child that the DHHS workers had ever seen. Despite the State's repeated attempts to provide services and rehabilitate Stacy, she persisted in her conduct and then attempted to conceal it. In fact, Stacy has bragged about faking drug tests to achieve negative results despite still using illegal drugs. Further, the record indicates Stacy has maintained relationships with individuals who are involved in drug trafficking. As law enforcement personnel testified, drug trafficking is very dangerous because any interruption in the selling of drugs usually incites violence and possibly murder. Newton, who was linked to Stacy as depicted in texts found on his phone during a drug bust, was found with a marijuana growing operation on his property along with methamphetamine, LSD, firearms, and a cell phone with images of child pornography. Turner, who was similarly arrested for drug trafficking in December 2018, specifically called Stacy requesting that she destroy evidence of the operation to which she responded that she complied. It is clear that by persisting in her drug use and continuing relationships with individuals like Newton and Turner, Stacy has continuously neglected Bella and has refused to give her necessary parental care and protection.

Separately, § 43-292(4) provides a separate basis for termination when a parent is found unfit by reason of debauchery, habitual use of narcotic drugs, or repeated lewd and lascivious behavior, which conduct is found by a court to be seriously detrimental to the health, morals, or well-being of the juvenile. This record is replete with examples of Stacy's lack of fitness in relation to her habitual drug abuse and drug-related lifestyle. In addition to Bella's being removed on three occasions and Stacy and Bella's testing positive for methamphetamine on one occasion, Stacy admitted to methamphetamine use spanning a period of 7 to 10 years. Due to Stacy's lifestyle, Bella has been exposed to methamphetamine on multiple occasions; one exposure leading to

Bella's having one of the highest hair follicle test results ever seen by the DHHS workers. Michael testified Bella exhibited signs of being exposed to methamphetamine because after being dropped off by Stacy for visits, Bella would be more restless than normal for her and on one occasion did not sleep for 2 days. Michael testified Bella "puk[ed] white stuff out of her nose and scream[ed] like she was on fire" and did not sleep, and when Michael discussed the incident with Stacy, she said it was teething. However, Michael testified that as a former methamphetamine user, he had experienced withdrawal, and it was "pretty bad." Bella's hearing tested at 30 percent, leading to a diagnosis of hearing loss, which Michael testified was consistent with a child who has been exposed to methamphetamine at high levels. According to Michael, Stacy has driven Bella while high to drop her off for Michael's parenting time. Based upon evidence of Stacy faking drug tests, Stacy's removal of her own and Bella's hair, and Stacy's own admissions in the record, the evidence is clear and convincing that Stacy's drug abuse persists. In addition, Stacy's insistence on associating with persons like Newton and Turner place Bella at risk of imminent harm. Based upon our de novo review, there is clear and convincing evidence to support the court's findings that grounds for termination were present pursuant to § 43-292(2) and (4).

ICWA

Stacy next argues that the State did not establish beyond a reasonable doubt through a qualified expert that continued custody by Stacy would lead to serious emotional or physical damage to Bella as required by ICWA before the court may terminate parental rights.

Regarding termination of parental rights, we have previously stated:

> To terminate parental rights, the State must prove by clear and convincing evidence that one or more of the statutory grounds listed in § 43-292 have been satisfied and that termination is in the child's best interests. *In re Interest of Walter W.*, 274 Neb. 859, 744 N.W.2d 55 (2008). NICWA adds two additional elements the State must prove before terminating parental rights in cases involving Indian children. *Id*. First, the State must prove by clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. See § 43-1505(4). See, also, *In re Interest of Walter W.*, *supra*. Second, the State must prove by evidence beyond a reasonable doubt, "including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." See § 43-1505(6).
>
> . . . .
>
> . . . This evidence must be established by qualified expert testimony provided by a professional person having substantial education and experience in the area of his or her specialty. *In re Interest of Shayla H. et al.*, 17 Neb. App. 436, 764 N.W.2d 119 (2009).

*In re Interest of Audrey T.*, 26 Neb. App. 822, 832-33, 924 N.W.2d 72, 81 (2019).

We first note that Stacy did not separately assign that the court erred in finding that there was clear and convincing evidence that active efforts have been made to prevent the breakup of the Indian family and that those efforts proved unsuccessful. Nevertheless, we briefly address the determination given its bearing on Stacy's assignment concerning the court's finding that continued custody will result in serious emotional and physical damage to Bella.

Stacy was provided services from May 2017 to January 2018 and included supervised parenting time, drug testing, and weekly counseling with a substance abuse counselor. Stacy also completed a psychological and parenting evaluation, a substance use evaluation, and a healthy communications class. The psychological and parenting evaluation noted Stacy was diagnosed with a methamphetamine use disorder, in early remission, and an unspecified adjustment disorder. The substance use evaluation was used to create a case plan for Stacy, which included participation in weekly counseling and 12-step meetings, sobriety monitoring, and involvement with Narcotics Anonymous. Encelewski testified that members of his tribe who repeatedly relapse on methamphetamine are offered drug testing and one-on-one counseling. These services are similar to the services and programs offered to Stacy. Despite Stacy's protracted struggles with drug addiction, we note the only service Stacy requested was help from DHHS in retrieving her older child's birth certificate.

While Stacy was active with the Celebrate Recovery group and a 12-step program in 2017, her statement made to Michael and text messages sent to Turner suggest she has not made progress. Stacy told Michael she can fake drug tests and fake urine, and masking agents were in fact discovered at her residence. According to Michael, Stacy has driven Bella while high to drop her off for Michael's parenting time.

Text messages to Turner also suggest Stacy is using drugs and is involved in drug trafficking. On November 11, 2018, Stacy texted: "Michael. I did seek treatment during our juvenile cade [sic]. I have proudly maintained my recovery. I took advantage of every single option that the courts made available to me. I have a new life and a new way of living." However, a few days later on November 18, 2018, Turner texted Stacy: "You were out here getting high a week and a half ago. . . . while I'm trying to support you to get your babies back (one of them you had with a dude you cheated on me with)." As part of an ongoing fight with Turner, Stacy informed him, "Duck [sic] seriously Shaun your [sic] a major reason I don't stay clean. Your [sic] always ducking [sic] talking shit, putting me down, making me feel like shit. Going on and on and on till [sic] I can't ducking [sic] stand it." These text messages show that while Stacy tells others she has stopped using drugs, she actually continues to get high and continues a relationship with Turner, who sells narcotics. In short, despite the State's active efforts here, those efforts have proven unsuccessful. When taken together with the State's efforts to place Bella with her Native American parent, and Encelewski's testimony that the State's efforts were culturally appropriate in connection with Stacy's condition, we find the State proved by clear and convincing evidence that efforts to separate Bella from Stacy and her drug addiction were culturally relevant active efforts to prevent the breakup of the Indian family.

Next, we turn our attention to the second Indian Child Welfare Act requirement that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child. This requirement must be supported by evidence beyond a reasonable doubt and include testimony of qualified expert witnesses. Neb. Rev. Stat. § 43-1505 (Reissue 2016). Qualified expert witness is defined in Neb. Rev. Stat. § 43-1503(15) (Reissue 2016) which lists five categories of experts in descending priority order, with the highest priority being, "[a] member of the Indian child's tribe or tribes who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family and childrearing practices" and with the last category

consisting of "[a]ny other professional person having substantial education in the area of his or her specialty."

Encelewski fits the first definition of a qualified expert witness because he is a member of the Ninilchik tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family and childrearing practices. Encelewski testified that he is the president and chairman of the Ninilchik Traditional Council and stated he helps to rear children in his community through outreach programs including fish camps, elders in youth programs, preschool programs, and native youth Olympics. Encelewski testified generally of the harm that occurs when children are left with methamphetamine users including putting them in depression and "in high danger risk."

Lieutenant Eads meets the definition of a qualified expert witness due to his substantial training in his area of drug enforcement. Eads testified drug dealing is dangerous and often results in physical violence, sexual violence, and death. Taken together, Encelewski and Eads established the danger to Bella in being exposed to a chronic methamphetamine abuser who associates with known drug dealers. Accordingly, based on the qualified expert witnesses' testimonies, the State proved beyond a reasonable doubt that Stacy's continued custody of Bella would expose Bella to the dangers associated with drug abuse, drug dealers, and a violent and turbulent lifestyle that is likely to result in serious emotional or physical damage to Bella. Thus, this assigned error fails.

BEST INTERESTS

Stacy's final assignment of error is that the State failed to meet its burden of proving termination of parental rights was in Bella's best interests because no direct evidence was presented regarding best interests.

In *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 508-09, 933 N.W.2d 873, 887-88 (2019), this court recently stated:

> In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the child. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id*. There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.
>
> The best interests analysis and the parental fitness analysis are fact-intensive inquiries. And while both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of the statute, and is also through a determination of the child's best interests. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id.*

In the present case, there has been no improvement despite the State providing services to Stacy. Hair follicle testing was performed on Stacy in May 2017 and showed positive results for amphetamines and methamphetamines, and Bella also underwent a hair follicle test in May 2017, which showed positive for methamphetamines and was the highest level for a child the DHHS office had seen. Stacy received services from May 2017 to January 2018, which included supervised parenting time, drug testing, and weekly counseling with a substance abuse counselor. Stacy also completed a psychological and parenting evaluation, a substance use evaluation, and a healthy communications class. The psychological and parenting evaluation noted Stacy was diagnosed with a methamphetamine use disorder, in early remission, and an unspecified adjustment disorder. The substance use evaluation was used in creating a case plan for Stacy, which included participation in weekly counseling and 12-step meetings, sobriety monitoring, and involvement with NA. Stacy was active with the Celebrate Recovery group and a 12-step program. Stacy was ordered to be tested for drug use via sweat patch and urinalysis, which results showed she tested negative for all illicit substances. Teeple testified Stacy was very good at doing what she needed to do, was always willing to meet with Teeple, and made use of the supervised parenting time.

However, as we stated in the previous section, Stacy's actions, admissions, and text messages contradict any assessment that she is making progress. Furthermore, notwithstanding the State providing services to Stacy, her only request for assistance from DHHS was help in locating the birth certificate of another child. Taken together with the evidence of Bella's exposure to methamphetamine because of her association with Stacy, Stacy's attempts to conceal her continued drug abuse and association with drug traffickers, and the experts' testimony governing the continued threat of harm to Bella due to Stacy's chronic drug use and dangerous associations, the record demonstrates clear and convincing evidence that Stacy is an unfit parent and terminating her parental rights is in Bella's best interests. Therefore, the court did not err in finding termination was in the best interests of Bella and this assigned error fails.

CONCLUSION

For the reasons stated above, we affirm the court's order terminating Stacy's parental rights to Bella.

AFFIRMED.

- 12 -